J-A11019-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LINDA KNIGHT | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| J.B. HUNT TRANSPORT, INC., AND | : | No. 1447 MDA 2017 |
| ANTHONY T. MCBETH, ESQUIRE, | : | |
| ADMINISTRATOR OF THE ESTATE OF | : | |
| MICHAEL R. BRYERTON | : | |

Appeal from the Judgment Entered September 15, 2017
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2015-CV-5506

BEFORE: STABILE, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED JULY 18, 2018**

Appellant Linda Knight (Knight) appeals from the judgment in favor of

Appellees J.B. Hunt Transport, Inc. (Hunt) and Anthony T. McBeth, Esq.,

administrator of the estate of Michael R. Bryerton (Bryerton) (collectively,

Defendants), entered following a bench trial on Knight's claim for negligence

against Bryerton. Knight claims that the trial court erred in denying her post-

trial motion seeking a new trial against Bryerton. Knight also challenges the

court's grant of summary judgment on her claims of fraudulent and negligent

misrepresentation against Hunt. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Initially, we state the facts as set forth by the trial court in its decision granting summary judgment:

> [On January 13, 2014,] Hunt's employee, . . . Bryerton, was driving a tractor trailer . . . when he lost control of the vehicle and collided with [Knight's] residence. According to [Knight], on the day of the accident, Hunt's representative, Tony Hardin, provided her with his business card and informed her he would report the incident to the home office. [Knight] also claims, two days after the accident, she met with Hardin and another Hunt associate, Wesley Griffin, . . . told her "we'll do right by you," which she understood to mean Hunt would cover any damages to her home not covered by her homeowner's policy.[1]
>
>> [1] At the time of the accident, [Knight] had a homeowner's insurance policy in the amount of $138,000.
>
> After collecting first-party homeowner's insurance proceeds, [Knight] contacted Service 1st to help clean up the property and reconstruct her home. In February 2014, she informed Hunt she was signing a contract to begin demolition and wanted confirmation that payment would be made from Hunt to Service 1st for demolition and clean up. Hunt agreed to pay the cost of demolition in an agreement dated February 26, 2014, and [Knight] signed a contract with Service 1st for demolition and clean up only; the total cost of which was $31,533.26. Hunt was to make payment upon the execution of a release agreement with [Knight]. Defendants allege [Knight] "expressed concern" with the release, and Hunt informed her she would "sign another release once the rebuild process began." [Knight] signed the first release and, on April 24, 2014, Hunt paid the cost of demolition and clean up, totaling $31,642.46.
>
> In May 2014, [Knight] began discussions with Service 1st about the rebuild and received an estimate of $166,835.93. She contacted Hunt and requested they pay the difference between the estimate and the $138,000 she had received through her insurance.[1] On June 2, 2014, [Knight] received a letter from

_____

[1] As explained later at trial, the difference between the policy amount and the reconstruction estimate was due to, among other things, construction

> Hunt's attorney informing her Hunt "would not be making any voluntary payments as a result of this situation because it resulted from an unforeseen, emergency medical situation to" Bryerton. This letter was issued after Hunt received a copy of the Coroner's Comprehensive Report of Bryerton's death investigation and learned he died of a sudden and unforeseen cardiac issue, which Defendants contend would negate any negligence.

Trial Ct. Op., 1/11/17, at 1-2. Two months later, Knight executed the contract to rebuild the home on August 21, 2014. R.R. at 372a.[2]

Knight sued Defendants, raising claims of fraudulent misrepresentation against Hunt, negligent misrepresentation against Hunt, and negligence against Bryerton. Defendants filed a motion for partial summary judgment on Knight's claims of fraudulent and negligent misrepresentation. The court granted the motion, and the case proceeded to a bench trial on Knight's outstanding negligence claim.[3]

Subsequently, the court found in favor of Defendants on March 30, 2017. Knight filed a timely post-trial motion, which the court denied on August

_____

regulations promulgated after the original home was built. The original home, which was located in a flood plain, had living space in the basement. N.T. Trial, 1/19/17, at 18. But due to new regulations, Knight could no longer use the basement for living quarters and, as a result, she requested construction of a second floor/loft area as compensation. *Id.* at 15-16. Knight testified that the livable square footage in the new home was "about the same" as the footage in the old home. *Id.* at 32.

[2] We cite to the reproduced record for the parties' convenience.

[3] We discuss the trial testimony, *infra*.

22, 2017. The court entered judgment, and Knight timely appealed and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.

Knight raises the following issues:

Did the [trial] court err in granting partial summary judgment to the Defendants on [Knight's] claims for negligent misrepresentation and fraudulent misrepresentation?

Did the [trial] court err in holding that the Defendants sustained their burden of proving that . . . Bryerton's heart attack was not foreseeable.

Knight's Brief at 4.

## Knight's Challenge to Grant of Partial Summary Judgment

In support of her first issue, Knight reiterates the facts alleged in her complaint and summarizes the trial court's reasoning in granting summary judgment. *Id.* at 10-11. In relevant part, Knight claims the first alleged misrepresentation occurred when, shortly after the accident, Hunt informed her that "we'll do right by you." *Id.* at 10; *accord* Defendants' Brief at 17.

According to Knight, Hunt's second alleged misrepresentation occurred six days after the coroner's report on Bryerton's cause of death. On March 11, 2014, Hunt emailed Knight stating that the "release would only pertain to this portion of the clean up. [Knight] will sign another release once the rebuild process begins." Knight's Brief at 10; R.R. at 298a; *accord* Defendants' Brief at 17. In Knight's view, "the only reasonable interpretation of that e-mail is that . . . Hunt was going to be paying not only for the cleanup but also for the reconstruction." Knight's Brief at 11. Knight construed both statements as

Hunt accepting responsibility for her damages and thus, she executed the contracts to clean up and reconstruct her home.[4]

Knight contends that two aspects of the court's reasoning for granting summary judgment on the negligent misrepresentation claim are erroneous. First, Knight challenges the court's statement that "at the time Hunt made the statements that [Knight] now complains of, they were unaware of the underlying cause of the accident." *Id.* at 11 (quoting Trial Ct. Op., 1/11/17, at 5).[5] Second, Knight challenges the court's alternative reasoning as follows:

> [Knight] is unable to show she justifiably relied on Hunt's statements. When [Knight] approached Hunt about the possibility of paying the difference between the rebuild estimate and the insurance proceeds, she was informed Hunt would not cover any costs related to the rebuild due to the fact they had learned the accident was caused by Bryerton's sudden medical emergency. Nonetheless, [Knight] subsequently entered into the rebuild contract with Services 1st, and did so with the knowledge Hunt would not be paying the bill. Therefore, [Knight's] claim fails and Defendants are entitled to summary judgment with respect to [negligent misrepresentation].

*Id.* (quoting Trial Ct. Op., 1/11/17, at 5).

---

[4] As noted above, the record reflects that Knight signed the clean-up contract on February 26, 2014 (before the March 11, 2014 email). R.R. at 37a. Knight signed the reconstruction contract on August 21, 2014 (after Hunt advised her in a letter dated May 30, 2014, and received by her on June 2, 2014, that it would not pay for construction). *Id.* at 307a, 372a-73a.

[5] We note that Knight's brief omitted citations to the trial court's opinion.

Knight contends the court's reasoning was faulty. Specifically, Knight maintains that Hunt notified her it would not cover rebuild costs in a letter received on June 2, 2014. *Id.*[6] Knight, however, points out that she had already executed a contract to rebuild her home and the contractor's first invoice was dated May 6, 2014, for $47,164.08, which Knight paid via check dated May 7, 2014. *Id.*[7] In Knight's view, this established her reliance on Hunt's representation. *Id.* at 12. Notably, although she challenged the court's disposition of her fraudulent misrepresentation claim in her statement of issues presented, Knight's brief omits any argument in support.[8]

Defendants counter with four arguments, of which we summarize three. First, Knight failed to identify any material issues of fact that Hunt intended to deceive her. Defendants' Brief at 18. Defendants acknowledge that at the time Hunt agreed to pay for demolition and clean-up costs, it had no knowledge of the cause of the accident. *Id.* Upon learning that Bryerton's

---

[6] Knight's brief stated that the letter was dated June 2, 2014, but there is no such letter.

[7] Knight did not cite where in the record this was established. We note that the record reflects only two contracts: (1) the demolition contract executed on February 26, 2014, for $31,533.26; and (2) the reconstruction contract executed on August 21, 2014, for $172,044.92. R.R. at 37a, 39a.

[8] We acknowledge that Knight included a lengthy block quote from *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999), regarding fraudulent misrepresentation, for the proposition that "a misrepresentation can take many forms." Knight's Brief at 12. But Knight did not articulate how, based on the *Bortz* Court's discussion, the trial court erred.

medical emergency led to the accident, Hunt declined future payment. *Id.*
Defendants maintain that there is no evidence that Hunt made any misrepresentations to Knight. *Id.* Absent evidence of scienter, Defendants argue Knight cannot establish Hunt's intent to deceive. *Id.*

Second, Defendants assert that Knight failed to adduce any evidence that she justifiably relied on any of Hunt's representations. *Id.* Defendants point out that Knight emailed Hunt on May 21, 2014, about whether Hunt would pay the additional reconstruction costs. *Id.* Hunt responded in a letter received by Knight on June 2, 2014, that it would not pay the additional costs. Nonetheless, Defendants claim, Knight continued to revise the blueprints for her home and ultimately signed a home reconstruction contract with Services 1st on August 21, 2014. *Id.* at 19.

Lastly, Defendants emphasize that Knight failed to argue how the trial court erred in granting summary judgment on the fraudulent misrepresentation claim. *Id.* at 20.[9]

In a footnote, Defendants also challenge Knight's rendition of the facts. *Id.* at 19 n.1 (referencing Knight's Brief at 11). Defendants note that Knight

---

[9] Defendants alternatively argue that Hunt's statement that it would "do right by her" should be construed as "a promise to do something in the future." *Id.* at 20. Under Pennsylvania law, Defendants assert, such a promise is not fraud. *Id.* (citing cases). Defendants thus reason that even if Hunt implicitly promised to pay for Knight's reconstruction costs, Knight's claim for fraudulent misrepresentation still fails. *Id.*

cited nothing in the record establishing that the first invoice was dated May 6, 2014, and paid on May 7, 2014. *Id.* According to Defendants, Knight testified that no reconstruction work was performed and she incurred no reconstruction costs before the end of May 2014. *Id.* (citing deposition testimony). Indeed, per Defendants, Knight testified that construction did not begin until July or August 2014. *Id.* (citing record).

The standard of review is well-settled:

> When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.

*Erie Ins. Exch. v. Moore*, 175 A.3d 999, 1008 (Pa. Super. 2017) (citation omitted).

### Knight's Negligent Misrepresentation Claim

The tort of negligent misrepresentation has four elements: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555,

561 (Pa. 1999) (citation omitted). The **Bortz** Court further explained as follows:

> The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words. Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another.

**Id.** (citations omitted).[10]

Turning to Knight's arguments, we agree with Defendants: Knight did not identify any material issues of fact that either statement was made under circumstances in which Hunt should have known it was false and was made with an intent to induce Knight to act on them. **See id.** We note the difficulty of ascertaining whether the statement of "we'll do right by you" or Hunt's March 11, 2014 email was false, *i.e.*, misrepresented any material facts. **See id.** The former statement was capable of multiple interpretations, and the latter statement explicitly stated that the release was for clean up only and advised Knight she would have to sign another release once reconstruction began.

But even assuming that the statements could be construed as misrepresentations, Knight did not identify any material issues of fact that Hunt ought to have known the statements were false and made such false

---

[10] No party has addressed whether Hunt owed a duty to Knight.

statements with an intent to induce her to rely on them. **See Bortz**, 729 A.2d at 561. Absent any material issues of fact regarding Hunt's intent to deceive, Knight cannot establish the trial court erred as a matter of law or abused its discretion in granting summary judgment. **See Moore**, 175 A.3d at 1008. Under these facts, the validity of Knight's interpretation of such statements is an inquiry distinct from identifying material issues of fact regarding Hunt's intent. **See Bortz**, 729 A.2d at 561. And, as Defendants correctly observe, she did not identify material issues of fact regarding her justified reliance on the alleged misrepresentations—particularly given that Knight signed the reconstruction contract two months **after** Hunt advised her it would not pay for reconstruction. **See** R.R. at 372a.

Knight also asserts that she executed a contract to rebuild her home prior to her first invoice, dated May 6, 2014, which she paid the next day. Knight's Brief at 11. But Knight did not identify where in the record this contract or invoice could be located. Our review of the record reveals only two contracts, neither of which was a reconstruction contract executed prior to receipt of the June letter. **See** R.R. at 37a, 39a.[11]

---

[11] We need not address Knight's contention regarding the court's unsubstantiated assertion that Hunt was unaware of the cause of the accident, **see** Knight's Brief at 11, because that contention does not address material issues of fact regarding Hunt's alleged negligent misrepresentations.

**Knight's Fraudulent Misrepresentation Claim**

As noted above, Knight failed to argue how the trial court erred by granting summary judgment on her claim for fraudulent misrepresentation. Thus, she has waived it on appeal. *See Gateway Towers Condo. Ass'n v. Krohn*, 845 A.2d 855, 861 (Pa. Super. 2004). But even if we construed Knight's block quote from *Bortz* on fraudulent misrepresentation as an "argument," she has not demonstrated entitlement to relief.

The tort of fraudulent misrepresentation has five elements:

(1) A representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and,

(6) the resulting injury was proximately caused by the reliance.

*Bortz*, 729 A.2d at 560 (citation omitted).

In *David Pflumm Paving & Excavating, Inc. v. Found. Servs. Co.*, 816 A.2d 1164 (Pa. Super. 2003) (*Pflumm*), this Court addressed whether the trial court erred by granting summary judgment on the plaintiff's fraudulent misrepresentation claim. *Id.* at 1171. This Court affirmed because, among other reasons, the plaintiff failed to identify any evidence of the defendant's intent to mislead. *Id.*

Here, Knight has not identified any material issues of fact regarding whether either statement was false or was made with the intent to mislead her—similar to her arguments regarding negligent misrepresentation. *See Bortz*, 729 A.2d at 560; *Pflumm*, 816 A.2d at 1171. Absent material issues of fact, Knight cannot establish reversible error. *See Moore*, 175 A.3d at 1008.

**Knight's Challenge to Denial of Motion for a New Trial**

Knight, for her last claim, asserts that the trial court erred in denying her post-trial motion for a new trial. By way of background, at the bench trial, the following facts were stipulated to, elicited, or established from trial depositions.

> Mr. Bryerton was declared dead at the scene of the accident by the Dauphin County Deputy Coroner. Subsequently, the cause of death was determined to be complications from coronary artery disease. [Knight] conceded at trial that [she does not] necessarily dispute that Mr. Bryerton had a sudden medical emergency that caused him to lose control of the tractor trailer, instead, [Knight] argued that the medical emergency was foreseeable.
>
> [Knight] submitted the deposition testimony of Joseph Cincotta, M.D., Mr. Bryerton's family physician attempting to show that cause of death was foreseeable and that Mr. Bryerton should not have been operating a tractor trailer/commercial vehicle at the time of this accident. The testimony from Dr. Cincotta concerned office visits in August of 2010, July 2011, August 2012 and his last visit prior to the accident on February 2013. These visits established Mr. Bryerton was obese, had type II diabetes and elevated LDL cholesterol which is an indication of an increase risk of vascular disease, heart attack and stroke. His family physician suggested that Mr. Bryerton take a drug called "statin" which lowers the LDL cholesterol. The office visits suggest the patient

- 12 -

declined that recommendation.[12]  Mr. Bryerton's last office visit, as referenced above, was in February 2013, with similar findings and he was referred for a CT scan later performed in July 2013 showing evidence of calcification of the left carotid artery.[13]  It was also established during Dr. Cincotta's testimony that there are side effects of taking the drug statin and while it may lower the risk of heart attack and stroke, it does not eliminate it.  In addition, Dr. Cincotta never determined it was necessary to contact PennDOT to advise them that Mr. Bryerton should not be driving a motor vehicle.

[Knight] also submitted the deposition testimony of Daniel Steven Isenschmid, Ph.D.  Dr. Isenschmid is employed as a forensic toxicologist and reviewed the toxicology report on Mr. Bryerton which showed an elevation of concentration of carbon monoxide in the blood at 12% saturation.  Toxic symptoms of carbon monoxide are noted at levels greater than 10%.  The Plaintiff presented his testimony in an attempt to show that perhaps Mr. Bryerton was not incapacitated and in a medical emergency at the time the fire consumed the house and truck cabin.  Dr. Isenschmid testified, however, that someone in a fire could have increased carbon monoxide in their lungs while unconscious but breathing.

\*    \*    \*

[Defendants] also called Wayne Ross, M.D., a forensic pathologist. . . .  Dr. Ross had worked with the Dauphin County Coroner's Office in examining Mr. Bryerton's body to determine the cause of death shortly after the accident.  Dr. Ross indicated that the thermal levels indicated that when the tractor trailer left the roadway and collided with the home it burst into flames resulting in thermal damage to the interior occupant and capsule.  Mr. Bryerton was found in the driver seat.  Dr. Ross examined Mr. Bryerton's heart which showed coronary artery disease and that this was the cause of death.  Dr. Ross also commented on the toxicology studies indicating that carbon monoxide level at 12% was compromised because it was drawn from tissue of the charred

---

[12] We note that Dr. Cincotta testified Bryerton affirmatively declined.  N.T. Dep., 11/14/16, at 8.

[13] Dr. Cincotta explained that calcification is commonly referred to as "hardening of the artery."  N.T. Dep., 11/14/16, at 12.

- 13 -

remains and potentially represented a false elevation. Dr. Ross concluded that the accident was caused by a sudden medical event. Dr. Ross further opined that elevated carbon monoxide at 12% was a false elevation due to compromised blood from charred remains. Dr. Ross further opined that this carbonaceous material in the blood would cause a false elevation in the results and should not interpreted as a sign of life at the time of the fire.

Trial Ct. Op., 3/30/17, at 2-4. Dr. Ross testified that after speaking with Bryerton's family, Bryerton was unaware he suffered from severe coronary artery disease. N.T. Trial, 1/16/17, at 82. We add that the record also reflects that Dr. Lacreasia K. Wheat, after a medical examination, certified Bryerton as fit to drive on September 10, 2013—a few months prior to the accident. Defs.' Ex. 4.

Knight argues that the record established Bryerton's heart attack was foreseeable. Knight's Brief at 13. Knight extensively cites to trial testimony and analogizes them to the facts in **Feagle v. Purvis**, 891 So.2d 1096 (Fla. Dist. Ct. App. 2004),[14] a decision from a Florida intermediate appellate court. According to Knight, the **Feagle** Court held that it was foreseeable that the decedent could have suffered a heart attack. Knight's Brief at 15. In Knight's

---

[14] We acknowledge that "it is well-settled that this Court is not bound by the decisions of federal courts, other than the United States Supreme Court, or the decisions of other states' courts." **Phelps v. Caperoon**, ___ A.3d ___, ___ n.18, 2018 WL 3016477 at *8 n.18 (Pa. Super. 2018) (citation omitted). "[O]ur Courts recognize that we are not bound by these cases; however, we may use them for guidance to the degree we find them useful and not incompatible with Pennsylvania law." **Id.** (citation omitted). Although Knight has not cited any Pennsylvania caselaw in support of this particular argument, we decline to find waiver. **See generally** Pa.R.A.P. 2119(a).

view, the evidence in this case clearly established that Bryerton knew if he did

not take the statin, he had an increased risk of a heart attack and "it was

foreseeable that such an event would occur." *Id.* Moreover, Knight contends,

Defendants' only evidence that the heart attack was not foreseeable was Dr.

Cincotta's testimony that he did not contact the Pennsylvania Department of

Transportation to advise it that Bryerton should not be operating a motor

vehicle. *Id.*

> The standard of review follows:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Amerikohl Mining Co. v. Peoples Natural Gas Co.*, 860 A.2d 547, 549–50

(Pa. Super. 2004) (internal quotation marks and citations omitted).

> In reviewing a trial court's denial of a motion for a new trial, the standard of review for an appellate court is as follows:

> It is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.

> Thus, when analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial court abused its discretion.

> Moreover, our review must be tailored to a well-settled, two-part analysis:

- 15 -

We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

***Gurley v. Janssen Pharms., Inc.***, 113 A.3d 283, 288-89 (Pa. Super. 2015)

(formatting, internal alterations, brackets, and citations omitted).

In ***Shiner v. Ralston***, 64 A.3d 1 (Pa. Super. 2013) (*per curiam*), this

Court summarized the affirmative defense of a sudden medical emergency:

the sudden medical emergency defense is an affirmative defense often pled as sudden loss of consciousness or incapacitation. Since the defense avoids negligence, it must be pled as new matter and proven by the defendant. Pa.R.C.P. 1030. Research failed to yield any Pennsylvania appellate decisions officially recognizing the defense, although our Supreme Court, in ***Bass v. Commonwealth***, 485 Pa. 256, 401 A.2d 1133, 1135-1136 (1979), acknowledged that ordinarily, where non-negligent conduct results in injury to another, it is not actionable. The Court illustrated that principle with a hypothetical involving an attorney on his way to the Prothonotary's Office to file an appeal who suffered an unexpected heart attack, lost control of his vehicle, and injured a bystander. The Court concluded that the attorney would not be held liable to the bystander, the implication being that the heart attack precluded a finding of negligence.

Federal courts applying Pennsylvania law have recognized and applied unconsciousness as a defense. ***See Freifield v. Hennessy***, 353 F.2d 97 (3d Cir. 1965) (under Pennsylvania law, an automobile operator who, while driving, is suddenly stricken by an unforeseeable loss of consciousness is not chargeable with negligence); ***see also Pagano v. Magic Chef, Inc.***, 181 F. Supp. 146 (E.D. Pa. 1960). Numerous jurisdictions recognize a similar defense. ***See*** Annotation: 93 A.L.R.3d 326; 2 Harper and James, Law of Torts, pp. 920, 921 § 16.7. The assumption is that when a person is unconscious and unable to act, he is incapable of negligence. Unforeseeable loss of consciousness, if proven, is a

complete defense to negligence, and the defendant bears the burden of establishing the defense.

*Id.* at 4-5.[15]

In *Feagle*, the case cited by Knight, the victim was on a lakeshore watching an informal boat race. *Feagle*, 891 So.2d at 1098. The decedent was racing a boat when he suffered a fatal heart attack, causing the boat to strike the victim. *Id.* The victim sued the decedent's estate, which raised the sudden medical emergency doctrine as an affirmative defense. *Id.* The estate moved for summary judgment, which the trial court granted; the victim appealed to the intermediate appellate court. *Id.*

Construing Florida law, the *Feagle* Court explained as follows:

Whether the defense of sudden and unexpected loss of capacity or consciousness is available, generally boils down to a question of foreseeability. Foreseeability, however, relates to both the negligence elements of duty and proximate causation, but does so in different ways. As the Florida Supreme Court noted in *McCain v. Florida Power Corp.*, 593 So.2d 500 (Fla. 1992), the duty element focuses on whether the conduct of the defendant foreseeably created a broader "zone of risk" that posed a general threat of harm to others, while the proximate causation element concerns whether and to what extent that conduct foreseeably and substantially caused the specific injury to the plaintiff. The court said further:

[Duty] is a minimal threshold legal requirement for opening the courthouse doors, whereas [proximate causation] is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open.

---

[15] The *Shiner* Court reversed the trial court's grant of summary judgment because there were material issues of fact as to whether the decedent's medical emergency was unforeseen. *Shiner*, 64 A.3d at 7.

> *Id.* at 502. The duty of care is generally a question of law. Cases involving sudden and unexpected loss of capacity, however, most often concern the foreseeability associated with proximate causation, and causation is generally a question of fact.

*Id.* at 1099 (some citations omitted). After summarizing the factual record, the *Feagle* Court identified material issues of fact as to whether the decedent should have foreseen his medical incapacity, and thus reversed the trial court's grant of summary judgment. *Id.* at 1102.

Initially, as Defendants accurately point out, Defendants' Brief at 25-28, Knight's reliance on *Feagle* is inapt, as *Feagle* involved an appeal from summary judgment, and Knight's negligence claim went to trial, where the court heard and weighed the evidence for both sides. *See id.* In any event, Knight's argument is essentially a challenge to the weight of the evidence. Although Knight argued the record established that it was foreseeable Bryerton would suffer a heart attack, the record also establishes Bryerton did not know he was suffering from heart disease, and thus could not have foreseen a heart attack. *See* N.T. Trial, 1/16/17, at 82; *see also* Defs.' Ex. 4 (certifying, after a medical exam, Bryerton was fit to drive). Viewing, as we must, the record in Defendants' favor, *see Amerikohl Mining Co.*, 860 A.2d at 549-50, we cannot perceive any abuse of discretion by the trial court in denying Knight's post-trial motion. *See Gurley*, 113 A.3d at 288-89.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>07/18/2018</u>