J-S17040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

PAMELA HACKENBURG, ADMINISTRATOR : IN THE SUPERIOR COURT OF
OF THE ESTATE OF FRANK T. MOTYL, : PENNSYLVANIA
DECEASED :
:
:
Appellant :
:
v. :
:
GRANE HEALTHCARE CO. AND ALTOONA :
CENTER FOR NURSING CARE, LLC, AND :
AMBER TERRACE :
:
:
: No. 1364 WDA 2015

Appeal from the Order August 5, 2015
in the Court of Common Pleas of Blair County Civil Division
at No(s): 2011-GN 2346

BEFORE: GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MAY 27, 2016**

Appellant, Pamela Hackenburg, Administrator of the Estate of Frank T.

Motyl, Deceased ("Decedent"), appeals from the order entered in the Blair

County Court of Common Pleas granting Appellees', Grane Healthcare Co.,

Altoona Center for Nursing Care, LLC, and Amber Terrace's, motion for

summary judgment. Appellant contends that there were material issues of

fact as to whether Decedent was capable of independently entering and

leaving the personal care home, Amber Terrace. Appellant avers that it was

---

[*] Former Justice specially assigned to the Superior Court.

reasonably foreseeable that Decedent would be struck by an impaired driver while crossing the street. We affirm.

The trial court summarized the facts and procedural posture of this case as follows:

> Altoona Center for Nursing Care, LLC, and Amber Terrace ("Amber Terrace") are the same entity functioning as a personal care home.
>
> *    *    *
>
> Decedent . . . became a resident of Amber Terrace on August 13, 2004. On July 9, 2010, [D]ecedent was fatally injured by an impaired driver[1] while walking across the intersection of 17th Street and Ninth Avenue in Altoona.
>
> [Appellant] was appointed Administrator of the estate of [Decedent] on November 1, 2010. [Appellant] began the instant action with the filing of a Writ of Summons on July 19, 2011. This [c]ourt issued a Writ Notice on August 27, 2013 instructing [Appellant] to file a Complaint within thirty days. [Appellant] filed a Complaint on September 26, 2013 to which [Appellees] filed Preliminary Objections on October 17, 2013. [Appellant] filed an Amended Complaint on November 4, 2013. [Appellees] again filed Preliminary Objections which the [c]ourt denied on January 23, 2014.
>
> The Amended complaint alleges that [Appellee] Amber Terrace knew or should have been aware of [D]ecedent's propensity to wander and run away and was negligent in failing to monitor and implement a support and care plan to address [D]ecedent's habits, including home rules regarding when a resident could leave and return to the facility. [Appellant] further averred that [Appellee] Grane Healthcare Co. failed to require a support plan for

---

[1] The police criminal complaint stated that the accused was driving under the influence of a controlled substance. R.R. at 160a. Where applicable, we refer to the reproduced record for the parties' convenience.

> [D]ecedent and employ competent staff despite provided consultation, advice, administrative support, and skilled nursing care at Amber Terrace. In response, [Appellees] denied the allegations and asserted that there was no duty to restrict [D]ecedent's movement nor were [Appellees] the proximate cause of [Decedent's] injuries.

Trial Ct. Op., 8/5/15, at 1-2 (citations omitted).

Appellees filed a motion for summary judgment. Argument was held on the motion on July 29, 2015. On August 7, 2015, the court granted the motion. On August 27, 2015, a praecipe to enter judgment was filed and judgment was entered on the same date. This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal.[2] The court filed a letter, in lieu of an opinion, relying on the existing record.

Appellant raises the following issues for our review:

> A. Whether the trial court erred in finding no duty on a personal care home to limit a resident's movement when the resident has a history of wandering?

> B. Whether the trial court erred in making factually [sic] determinations as opposed to determining whether genuine issues of material fact exists?

---

[2] We note that Appellant's Rule 1925(b) statement contains issues that are not raised on appeal. *See Gurley v. Janssen Pharm., Inc.*, 113 A.3d 283, 288 n.11 (Pa. Super. 2015) (issues raised in Rule 1925(b) and not addressed in the statement of questions or body of brief held abandoned on appeal).

> C. Whether it is reasonably foreseeable to a personal care home that a resident with a history of wandering would be struck by a vehicle at 5:30 a.m. unaccompanied?

Appellant's Brief at 3.

Appellant argues that Appellees breached the duty of care to Decedent, as a resident of a personal care home. *Id*. at 9. Appellant contends the report of Mark Levine,[3] an expert in senior care administration, indicates "that Amber Terrace was negligent in failing to assess [Decedent's] risk of unsafe walking as well as its failure to develop behavioral strategies to minimize his risk and monitor those through interventions to increase his safety." *Id.* at 14. Appellant claims that "[t]he fact that the driver that struck and killed [D]ecedent was impaired does not change the fact that it was reasonably foreseeable that [Decedent] would be struck by a vehicle while walking." *Id.* Appellant avers that there is a material issue of fact as to whether Decedent's "condition had significantly changed to prompt an additional assessment or to update his support plan." *Id.* at 18. Appellant states that as "Mr. Levine indicates, both [Decedent's] son and daughter indicated they recognized cognitive changes in [him] during his stay at [Amber Terrace]." *Id.* Lastly, Appellant contends that it was reasonably foreseeable to Appellees that Decedent would be struck by a vehicle at 5:30 a.m. *Id.* at 19. Appellant is due no relief.

---

[3] *See* R.R. at 171a-79a.

We address Appellant's issues together because they are interrelated.

Our review is governed by the following principles:

> The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. . . .

***Varner-Mort v. Kapfhammer***, 109 A.3d 244, 246-47 (Pa. Super. 2015)

(citation omitted).

It is well established that

> [i]n Pennsylvania, the elements of a cause of action based upon negligence are:
>
> > (1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks;
> >
> > (2) defendant's failure to conform to the standard required;
> >
> > (3) a causal connection between the conduct and the resulting injury;
> >
> > (4) actual loss or damage resulting to the plaintiff.

- 5 -

***R.W. v. Manzek***, 888 A.2d 740, 746 (Pa. 2005) (citations omitted).

> It is beyond question that the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation. Furthermore, our Supreme Court has stated that ". . . even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct, and it must be shown to have been the proximate cause of plaintiff's injury."

> "Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." Proximate cause does not exist where the causal chain of events resulting in plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm.

***Lux v. Gerald E. Ort Trucking, Inc.***, 887 A.2d 1281, 1286-87 (Pa. Super. 2005) (citations omitted).

A personal care home is statutorily defined as follows:

> **"Personal care home"** means any premises in which food, shelter and personal assistance or supervision are provided for a period exceeding twenty-four hours for four or more adults who are not relatives of the operator, who **do not require the services in or of a licensed long-term care facility** but who do require assistance or supervision in such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration.

62 P.S. § 1001 (emphasis added).

The Pennsylvania Administrative Code addresses the rights of residents of personal care homes. The Code provides that "[a] resident has

- 6 -

the right to leave and return to the home at times consistent with the home rules and the resident's support plan." 55 Pa. Code § 2600.42(m). Furthermore, "[a] resident shall be free from restraints." *Id.* § 2600.42(p).

The Code provides the criteria for a care plan.

> (c) The resident shall have additional assessments as follows:
>
> (1) Annually.
>
> (2) If the condition of the resident significantly changes prior to the annual assessment.

55 Pa. Code § 2600.225(c)(1), (2).

Morgan Wiser, a "LPN and a personal care administrator," was deposed. Dep., 5/11/15, at 9.[4] She worked at Amber Terrace from January of 2006 until September 2011. *Id.* at 12. She testified, *inter alia*, as follows.

> [Counsel for Appellant]: In 2009 and 2010, let's talk about those time periods. You were the personal care administrator; correct?
>
> A: Uh-huh (yes).
>
> Q: Whose responsibility would it have been to do the support plan?
>
> A: I did the support plan.
>
> Q: . . . What information did you take into account in preparing the support plan for [Decedent]?

---

[4] We note that the reproduced record does not contain the first twenty pages of the deposition.

A: Can you be more specific?

Q: . . . Did you utilize the nurse's notes, for example . . . .

A: Yes. [Decedent] was very independent, I'm sure as you know, through reading through his chart. . . .

\* \* \*

Q: Would you rely on the medical evaluations done by a doctor on a yearly basis?

A: For the support, yes.

Q: . . . Would you rely on the daily notes that were provided as far as, for example, the people that dealt with him on a daily basis?

A: Possibly. We were a small unit and, I mean, we really knew our residents incredibly well. . . .

\* \* \*

Q: Now, in the support plan, there are things you want to accomplish; correct? For example, goals and things like that are established for [Decedent]; correct?

A: Sure.

Q: . . . Who's responsible for making sure those goals are met or obtained, is my question?

A: Well, [Decedent's] support plan, everybody's support plan is different based on what their goals may be. Okay. [Decedent] was very independent. I don't believe there was a whole lot of goals in [Decedent's] support plan where anybody needed to be monitoring.

Q: Well, you said that [Decedent] was independent. Were you aware of what he got there [sic] that it was a result of an automobile accident involving him as a pedestrian.

A: Uh-huh (yes).

\*    \*    \*

Q: . . . You're aware that in 2007, I believe it was, he was bit by a dog and didn't know where he was bit?

A: . . . I don't know what you mean by he did not know where he was bit, but that happened because [Decedent] was a volunteer with nursing services who provided Meals on Wheels. And it was a consumer's dog that bit him. So maybe he meant in that statement he did not know the consumer by name. . . .

\*    \*    \*

Q: As part of the home rules and regulations, were there any specific hours when the residents were permitted to leave the premises?

A: No.

Q: So if they wanted to leave at three o'clock in the morning, that was okay?

A: It's a personal care home. Absolutely. It's not a lockdown unit.

R.R. at 75a-79a, 84a-85a.

Counsel showed Ms. Wiser the resident handbook. *Id.* at at 85a.

Q: . . . This indicates that there's an escort service available for residents who have appointments in the community; correct?

A: That is for the nursing home section of the building.

Q: . . . That's what?

A: This is for the long—term care section of the building . . . .

\*    \*    \*

Q: What were the home rules relative to times that [Decedent] could leave and come back?

A: . . . [P]eople are free to come and go as they choose. It's a personal care home. Again, it's not a lock[down] unit.

*     *     *

Q: Now, this residential personal care home support plan is dated August 4th, 2009; correct?

A: Yes.

Q: Is this your writing?

A: It looks [sic] to me.

*     *     *

Q: . . . So you indicate that [Decedent's] socially independent and visits with friends in the community. When you say community, are you referring to community as in the building or community as in—

A: No.

*     *     *

Q: . . . What friends did he have living in the community he was going to visit, if you know?

A: He made frequent rounds to the library. He was at the library multiple times a week, and he became friends with the people who worked there. So he would visit them often.

    Grannie's was one of his favorite restaurants that he would go to, same thing, as well as our Waffle King. He was also involved with St. Vincent DePaul. Shields Trophies, he would go to Shields Trophies often. He liked to give people little plaques if he thought you did an excellent job.

*     *     *

Q: You were involved with [Decedent] from 2006 through the time of his death; correct?

A: Correct.

Q: Did you see or notice any changes in his mental outlook or his abilities?

A: No, not at all.

Q: Okay.

A: Not at all.

Q: Were you aware that in October of 2007, he was walking on the Interstate after dark and was brought back by the police?

A: I recall that.

Q: Were you aware that he was gone over eight hours?

A: Yes.

Q: Was there something out of the ordinary or unusual for [Decedent]?

A: Well, [Decedent] would often be gone for long periods of time. Now, when that says the Interstate, that does not mean I-99. [Decedent] went to Juniata College. Again, he really loved to donate books. He was donating books to the library at Juanita College. He did not walk there. I can't remember now if it was a friend, a pastor friend, he had that took him there. And [Decedent] lived in that area, if you know where Juniata College is in Huntington, he lived in Milroy at some point in time. I believe it was called Milroy. It's right past Huntington.

So [Decedent] was familiar with walking . . . . And I can remember the conversation with him. He walked part of that way because he wanted to save money before he called for the taxi to come pick him up. And that was an area he had walked throughout his life. It wasn't on a true like I-99.

* * *

Q: Now, did you ever take any steps to prevent [Decedent] from leaving prior to six o'clock in the morning?

A: No.

Q: . . . Were there ever any complaints from any family or friends about [Decedent] leaving prior to 6:00 a.m. in the morning.

A: No.

* * *

Q: Would he go by himself or was there someone with him?

A: Oh, no. [Decedent] was very independent and came and left on his own.

Q: When you tell me he's independent, explain to me exactly what you mean.

A: He was able mentally and physically to come and go as [sic] his own free will, as documented through all the physician notes in that medical record, including the day before he died.

* * *

Q: How were you notified that [Decedent] was hit by a vehicle?

* * *

Q: My question is, were you at the facility when notification came from the police?

A: I was.

Q: Were you the one that was notified?

A: What happened that day was people noticed driving into work that there was an accident on 17th Street. Immediately a staff member had a concern, could that be [Decedent] because that's an area he normally walks. You know, somebody was injured. We wanted to make sure [Decedent] was okay. So Roger, my boss, took a picture to the police, because at that time, and this is a little bit of an example of what good health [Decedent] was in, he didn't have identification on him and they thought it was a 58-year-old man.

So Roger took a picture of [Decedent]. Well, first Roger went to see—. I can't remember exactly what all he did, but he went first or he called and they said could you bring a picture. And he brought a picture and then Roger came back and said it was [Decedent] who was hit.

Q: And that's an area you said he liked to walk on a regular basis?

A: . . . It was on the way to our Waffle King, St. Vincent DePaul where he would go often.

Q: Now, based on your observations of him, you said that you thought he was healthy at the time?

A: Oh, my goodness, yes.

Q: . . . No problems with his vision or anything like that?

A: No, he didn't wear glasses.

Q: No problems with his gait?

A: . . . He would take the steps from the lobby to the seventh floor multiple times a day.

*     *     *

Q: What else can you tell me about [Decedent's] condition just before he passed away, health-wise?

A: He was wonderful. I mean, do you mean how he got around?

Q: Yes.

A: He could probably out walk me. And I'm not just saying that. He was alert and oriented, you know. He did quite well.

*Id.* at 88a, 92a, 94a, 96a-97a, 99a-100a, 102a-03a, 107a-11a.

Ms. Wiser was questioned by Appellees' counsel and testified as follows.

Q: . . . When we talked about the structure of the personal care home, what was it that you or your staff did for [Decedent] on a daily basis . . .?

A: Well, we provided him his meals if he wasn't going out to eat. A lot of time he'd help set up the dining room actually. He would get the coffee ready or set things out on the tables. And his medication. That was it. He showered himself. He did everything himself.

Q: You talked about some of the places he would go in the community. How often would he make those social trips that you discussed?

A: He was out and about daily.

Q: Every day.

A: Every day he was out and about.

\* \* \*

Q: Now, as the personal care administrator who worked in that facility every day, you got to know a lot of the residents, I take it?

A: Yes.

Q: Did you get to know their families?

- 14 -

A: Oh, yeah.

Q: Did you get to know the people that came to visit?

A: Absolutely.

Q: Pam Hackenburg is [Decedent's] daughter who's sitting in the room. Have you ever met Ms. Hackenburg before?

A: No, I have not.

Q: Did you ever see her at the facility?

A: No, I have not.

Q: Do you ever recall talking to Ms. Hackenburg?

A: No.

Q: Do you recall looking at [Decedent's] chart and seeing that at some point in time Ms. Hackenburg was reflected as his emergency contact?

A: . . . At one point in time, and I don't remember when exactly. I know we went around with face sheets just to make sure any information we had with all the residents was correct on their face sheets. And [Decedent] said that this was not his emergency contact. He didn't recognize her as being his daughter anymore.

Q: And you're pointing to a document. . . . Could you describe what that document is?

A: It's a face sheet. And what's on that is the resident's name, the date of admission, his date of birth, age, religion, who his doctor is, his Social Security number, and his emergency contact.

Q: . . . And Ms. Hackenburg's name is crossed out and there's the writing there that says removed by resident request. Is that your handwriting?

A: It is.

Q: And did [Decedent] ask you to remove Ms. Hackenburg's name from there?

A: He did.

\* \* \*

Q: Do you recall looking through the chart and seeing an incident about [Decedent's] Social Security payments not being received by the facility?

A: I do.

Q: And can you tell me what you recall about that?

A: The administrator who was there prior to me, [Decedent] was upset, I believe, because he still didn't receive his money. And I believe at one point called the Social Security office. They had determined that his checks were cashed. They were being mailed to his residence. And I know that [Decedent] felt that his daughter was involved with that . . . .

Q: . . . We're looking at—are these progress notes for residents?

A: Yeah.

Q: They would be nurse's progress notes?

A: Correct.

Q: . . . Now, do you know whose handwriting this is?

A: This was Nora Pennington. She was the administrator prior to me.

Q: . . . And that is dated January the 17th of 2005?

A: Correct.

\* \* \*

Q: . . . In the context of your plans of care, [Appellant's counsel] asked you if you would rely upon the physician evaluations?

A: Right.

Q: And you would rely on those; correct?

A: Oh, absolutely.

Q: And in reviewing the most recent physician evaluation prior to [Decedent's] passing, can you tell us who it was that performed that evaluation?

A: That was Dr. Mextorf.

*   *   *

Q: Now, you mentioned that the day before [Decedent's] passing, he was out of the building in Pittsburgh. Can you expound upon that for us? Why was he in Pittsburgh?

A: He had an outpatient procedure done in Pittsburgh the day before.

Q: And do you recall knowing about that in advance of the procedure.

A: Yes.

Q: And what was that procedure?

A: It was a TURP.

Q: T—U—R—P.

A: Correct.

Q: And do you know what that means?

A: Yes, he was having problems with his prostate.

Q: . . . And so they would perform this TURP procedure at the VA Hospital in Pittsburgh?

A: Correct.

Q: And do you know how he got to Pittsburgh?

A: He used a shuttle from the VA.

Q: To your knowledge, did any family member take him to this medical appointment?

A: No, no.

Q: He used the shuttle to get from Altoona to Pittsburgh?

A: Correct.

Q: Did he go by himself?

A: Correct.

Q: Did he have the procedure done to your knowledge?

A: Yes, he did.

Q: Did the VA Hospital release him independently?

A: They did.

Q: And do you know how he got back from the VA Hospital in Pittsburgh to Altoona?

A: The shuttle.

Q: The VA shuttle?

A: Correct.

Q: And do you know where the VA shuttle would pick him up?

A: The VA Hospital.

Q: And where is the VA Hospital in relation to Amber Terrace?

A: Probably maybe three miles.

* * *

Q: Were you interviewed by the police at any time for this incident?

A: Yes, the police and the state inspection or the state inspector, the people who inspect personal care homes, the Department of Public Welfare, also came to our building that day because I called to notify them of the incident. About two hours later, two of them came in.

Q: Why would you notify the Department of Health about the incident.

A: It's a regulatory [sic].

Q: So if one of your residents passes away, you have to notify the department?

A: Correct, correct.

* * *

Q: And what transpired in response to the phone call?

A: They ended up showing up for an onsite review of his medical record. They interviewed myself, other staff, and some residents to make sure that, you know, everything was accurate, that he was alert and oriented, you know, that he was able to come and go as he pleased.

* * *

Q: They came the same day?

A: Same day.

Q: And was there any action taken by the Department of Health regarding [Decedent's] passing?

- 19 -

A: No. We were not found at any fault for anything that happened.

Q: They felt that everything was in order?

A: Yes.

*Id.* at 119a-20a, 122a-25a, 127a-33a.[5]

The Adult Residential Licensing Personal Care Home Support Plan indicated that Decedent had no mental health needs. *Id.* at 138a. He did not require any behavioral care services. *Id.* He was socially independent and visited with friends in the community. *Id.* at 139a.

In the case *sub judice*, the trial court opined:[6]

> [Appellant] argues that [Appellees] had the duty to restrict [D]ecedent from leaving the facility, particularly in the early morning hours. This position is contrasted by the personal care home assessments and evaluations that indicated that [D]ecedent was mentally and physically

---

[5] We note that at the conclusion of the deposition, the record indicates that "Dr. Mextorf's resident medical evaluation dated August 5 of '09 was marked as Exhibit B." *Id.* at 133a-34a. Our review of the certified record reveals that this medical evaluation was marked as Exhibit "F." Ms. Wiser testified that Dr. Mextorf was "the house doctor." *Id.* at 74a. The resident medical evaluation form indicated that [Decedent] "walks without assistance" and "can self-administer medications with no assistance from others." *Id.* at 149a. Dr. Mextorf's recommendation for appropriate level of care was "Personal Care Home." *Id.*

[6] We note that the trial court addressed the issue of whether Appellees had a duty to restrict Decedent's movement and therefore breached its duty of care in part based upon its examination of "the history of corporate negligence claims particularly in the context of nursing homes." Trial Ct. Op., 8/5/15, at 4. "We are not bound by the trial court's rationale, and may affirm its ruling on any basis." *The Brickman Grp., Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 928 (Pa. Super. 2004) (citation omitted).

capable to come and go as he desired. Moreover, the alleged risk of allowing [D]ecedent to leave the facility at any time was not the cause of [D]ecedent's fatal injuries; instead, the harm was caused by an impaired driver. . . . [Appellees] did not create nor could reasonably foresee the possibility that [D]ecedent would have left Amber Terrace on his daily outing and been struck and killed by an impaired driver.

. . . A consequence of imposing a duty upon [Appellees] on the facts on [sic] this case would infringe on the resident's rights to leave the facility despite the recommendations of the support plan. . . . Here, Amber Terrace's home rules did not restrict the residents from leaving the premises at specified hours. . . .

Decedent's personal care home annual assessment dated August 8, 2008[7] designated [D]ecedent as a "mobile resident" who[ ] had no impairments as to judgment, comprehension, communication, memory, and mobility; wandering was not a problem. Similarly, Decedent's personal care home plan dated August 4, 2009[8] provides [D]ecedent had no needs in regards to his dental, vision, mental health, and behavioral care services . . . . Significantly, [D]ecedent's 2009 plan noted that "[r]esident is socially independent" and "visits with friends in the community." As part of these needs, [D]ecedent was to "sign in and out on 4th floor when entering or leaving the building." These sign in sheets accounted for residents during fire drills.

* * *

[Appellees] alternatively argued that they neither caused [D]ecedent's injuries and the impaired driver's conduct was a superseding cause that relieved [Appellees] of any liability. Although it is not necessary for the [c]ourt

___

[7] *See* R.R. at 142a-47a. The personal care home assessment document's pagination indicates that it contained seven pages. However, page seven is not in the certified record or in the reproduced record.

[8] *See* R.R. at 137a-40a.

to address the argument, the [c]ourt does so . . . as an additional basis for granting [Appellees'] Motion for Summary Judgment.

[Appellant] must establish a causal connection between [Appellees'] conduct and that such was the proximate cause of [D]ecedent's injuries.

\* \* \*

[I]n viewing the evidence in the light most favorable to [Appellant], the [c]ourt finds that the fatal accident caused by the impaired driver was not foreseeable as a natural and probable outcome of [D]ecedent leaving Amber Terrace whenever he desired.

\* \* \*

[T]he drunk driver's actions constituted a superseding cause that relieved [Appellees] of liability.

Trial Ct. Op. at 6-7, 9-11 (citations omitted). We agree no relief is due.

Ms. Wiser prepared the support plan for Decedent. She was involved with him from 2006 until the time of his death. She testified that Decedent was independent and visited with his friends in the community. She did not observe any changes in his mental outlook or his abilities. He was able to come and go as he pleased. The day before he died, he went independently to the VA Hospital in Pittsburgh for an outpatient procedure. He took walks on a regular basis. She stated that she never met Decedent's daughter and in fact Decedent did not recognize her as being his daughter.

We find no merit to Appellant's claim that Appellees should have restricted Decedent's walking because it was unsafe. *See* 55 Pa. Code § 2600.42(m), (p). Appellant has not established that Appellees were

negligent in failing to establish a care plan for Decedent that would restrict his movement. **See R.W.**, 888 A.2d at 746. Appellant's contention that it was reasonably foreseeable that Decedent would be struck and killed by an impaired driver at 5:30 a.m. is without merit. **See Lux**, 887 A.2d at 1286-87. We find no error of law or abuse of discretion by the trial court. **See Varner-Mort**, 109 A.3d at 246-47. Therefore, we affirm the order granting Appellees' motion for summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2016

- 23 -