J-A12014-17

2017 PA Super 372

| ERIE INSURANCE EXCHANGE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| TRACY L. MOORE AND HAROLD E. MCCUTCHEON, III, INDIVIDUALLY AND AS ADMINISTRATORS OF THE ESTATE OF HAROLD EUGENE MCCUTCHEON, JR., AND RICHARD A. CARLY | |
| APPEAL OF: RICHARD A. CARLY | |
| | No. 869 WDA 2016 |

Appeal from the Judgment Entered June 15, 2016
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2014-4931

BEFORE: OLSON, J., SOLANO, J., and RANSOM, J.

OPINION BY SOLANO, J.:  **FILED NOVEMBER 22, 2017**

Appellant Richard A. Carly appeals from the summary judgment entered on June 15, 2016, in favor of Appellee Erie Insurance Exchange in Erie's action for a declaration that it is not obligated to defend or indemnify the Estate of Harold Eugene McCutcheon, Jr. in a personal injury action filed by Carly. We reverse.

On September 26, 2013, McCutcheon went to the home of his former wife, Terry L. McCutcheon, killed her, and then committed suicide. Before McCutcheon killed himself, Carly arrived unexpectedly at the home, struggled with McCutcheon, and was seriously injured by shots fired from McCutcheon's gun. Erie contends that policies that it issued to insure

McCutcheon do not cover Carly's injuries because McCutcheon inflicted them intentionally. Carly contends that, as alleged in his complaint against McCutcheon's Estate, the discharge of the gun and resulting injuries were unintentional, and Erie therefore is required to provide a defense and indemnity. The trial court agreed with Erie. We reverse because the facts pleaded in Carly's complaint against the Estate allege that Carly's injuries were caused by unintentional conduct.

Carly filed his complaint against McCutcheon's Estate in the Court of Common Pleas of Washington County on February 20, 2014.[1] He named as defendants the administrators of the Estate — McCutcheon's children, Tracy Moore and Harold E. McCutcheon, III. The complaint alleged:

3. All of the events hereinafter complained of occurred on September 26, 2013, at or around 11:45 p.m. at the residence of Terry L. McCutcheon, . . . [in Washington, Pa.].

4. [The] residence where the incident hereinafter set forth occurred was owned by Terry L. McCutcheon, the divorced wife of Harold Eugene McCutcheon, Jr.

5. On or about September 26, 2013, Harold Eugene McCutcheon, Jr. (decedent) had notified his children, Tracey L. Moore and Harold E. McCutcheon, III, by a written note that he was going to the home of his former wife, Terry L. McCutcheon, . . . to kill her and then commit suicide.

6. . . . [P]rior to the incident occurring on September 26, 201[3], at [Terry McCutcheon's residence,] Terry L. McCutcheon had been to the residence of Richard A. Carly . . ., since they had been dating at the time.

_____

[1] **Carly v. Moore**, Dkt. No 2014-930 (C.P. Wash. Cnty.).

- 2 -

7.      On September 26, 201[3], shortly before 11:00 p.m., Terry L. McCutcheon left the home of . . . Richard A. Carly, and proceeded to her residence . . . .

8.      . . . [P]rior to Terry L. McCutcheon arriving at her residence, decedent had broken into her home and was waiting in order to shoot and kill Terry L. McCutcheon, and then commit suicide thereafter.

9.      . . . [A]fter leaving the home of . . . Richard A. Carly, Terry L. McCutcheon arrived at her home . . . at around 10:55 p.m.

10.    On September 26, 2013, around 10:55 p.m., Terry L. McCutcheon made a cell phone call from her residence to . . . Richard A. Carly, to express to him that she had arrived at her home, and during the conversation, the call was terminated unexpectedly.

11.    . . . [Carly] believes that the decedent approached Terry while she was on the phone talking to [Carly] in order to kill her.

12.    Sometime during or after the call made by Terry L. McCutcheon to Richard A. Carly on September 26, 2013, decedent physically assaulted Terry L. McCutcheon and then shot her twice in the upper torso causing her death.  This occurred on the main floor where her bedroom was located.

13.    After said phone call had been disconnected, Richard A. Carly attempted to reach Terry L. McCutcheon by calling her back, but received no answer.

14.    . . . [A]s a result of not being able to reach Terry L. McCutcheon by telephone, . . . Richard A. Carly[] drove to [Terry McCutcheon's residence] from his residence to talk to Terry L. McCutcheon.  He arrived at Terry's residence at about 11:45 p.m.

15.    On September 26, 2013, at approximately 11:45 p.m., . . . Richard A. Carly[] approached the front door to the residence of Terry L. McCutcheon and rang the door bell a couple times but received no answer.

16.    . . . [A]s a result of receiving no answer, [Carly] became concerned and put his hand on the doorknob of the front door in

- 3 -

order to enter and the door was suddenly pulled inward by decedent who grabbed [Carly] by his shirt and pulled him into the home.

17. At the time that decedent pulled [Carly] into the home, decedent was screaming, swearing, incoherent, and acting "crazy."

18. . . . [O]nce [Carly] was inside the home, a fight ensued between the two and at the time, decedent continued to have the gun in his hand, which gun decedent apparently had shot and killed Terry L. McCutcheon, and was going to use to commit suicide.

19. . . . [A] struggle ensued between decedent and [Carly] thereby knocking things around, and in the process decedent negligently, carelessly, and recklessly caused the weapon to be fired which struck [Carly] in the face inflicting the injuries and damages as are more fully hereinafter set forth.

20. . . . [D]uring the struggle, [Carly] believes that other shots were carelessly, negligently and recklessly fired by decedent striking various parts of the interior of the residence and exiting therefrom.

21. All of the injuries and damages sustained by . . . Richard A. Carly[] were solely and wholly, directly and proximately caused by the negligence, carelessness and recklessness of the decedent, Harold Eugene McCutcheon, Jr., as follows:

  a. In carelessly and recklessly causing a firearm to be discharged thereby striking [Carly].

  b. In failing to regard the safety and well being of [Carly] and engaging in reckless conduct.

  c. In evidencing a reckless disregard for the safety of [Carly].

  d. In recklessly discharging a firearm.

  e. In breaching a duty of care decedent owed to [Carly].

  f. In failing to appreciate and realize that there was a strong probability of harming [Carly] and using conduct that created

- 4 -

an unreasonable risk of physical harm to [Carly].

g. In negligently tossing his arm around in which hand the gun was contained thereby recklessly shooting off various rounds in and about the room where [Carly] and decedent were struggling, one such round striking [Carly].

h. In being mentally disturbed to the extent that decedent needed or was undergoing mental treatment at the time.

i. In possibly being under the influence of alcohol and/or drugs at said time.

Complaint, **Carly v. Moore**, pp. 2-6.  As a result of being shot in the face, Carly suffered "severe, serious and catastrophic injuries."  **Id.** at 6.

On September 26, 2013, the date of the shooting, McCutcheon was an insured under two policies issued by Erie.  One, a homeowner's insurance policy ("Homeowner's Policy") stated:

We will pay all sums up to the amount shown on the Declarations which anyone we protect becomes legally obligated to pay as damages because of bodily injury or property damage caused by an occurrence during the policy period.  We will pay for only bodily injury or property damage covered by this policy.

Homeowner's Policy at 14 (bold type identifying defined terms deleted).  The Homeowner's Policy defined an "occurrence" as "an accident including continuous or repeated exposure to the same general harmful conditions." **Id.** at 5.  The Policy included the following exclusion:

We do not cover under Bodily Injury Liability Coverage, Property Damage Liability Coverage, Personal Injury Liability Coverage and Medical Payments To Others Coverage:

1. Bodily injury, property damage or personal injury expected or intended by anyone we protect even if:

- 5 -

> a. the degree, kind or quality of the injury or damage is different than what was expected or intended; or
>
> b. a different person, entity, real or personal property sustained the injury or damage than was expected or intended.
>
> We do cover reasonable acts committed to protect persons and property.

*Id.* at 15 (bold type identifying defined terms deleted).

The other Erie policy was an excess liability policy ("Excess Policy").

This policy stated:

> We pay the ultimate net loss which anyone we protect becomes legally obligated to pay as damages because of personal injury or property damage resulting from an occurrence during this policy period. We will pay for only personal injury or property damage covered by this policy. This applies only to damages in excess of the underlying limit or Self-Insured Retention.

Excess Policy at 4 (bold type identifying defined terms deleted). The Excess Policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage which is neither expected nor intended." *Id.* at 3. It included the following exclusion: "We do not cover . . . personal injury or property damage expected or intended by anyone we protect. We do cover reasonable acts committed to protect persons or property." *Id.* at 4 (bold type identifying defined terms deleted).

On August 14, 2014, Erie filed this action for a declaratory judgment to determine whether it was obligated to provide coverage for the claims made against McCutcheon's Estate in Carly's complaint. Trial Ct. Order,

5/31/16, at 3. The declaratory judgment action requested a declaration that Erie "has no duty to provide a defense, indemnity, or other coverage" to Moore, McCutcheon III, or the Estate "for the claims asserted against them in the [Carly's suit], or any other claims arising from the September 26, 2013 incident." Compl., 8/14/14, at 9, *ad damnum* clause.

On May 13, 2015, after the parties had engaged in discovery, Carly filed a motion for entry of summary judgment in his favor. Mot. for Summ. J., 5/13/15, at 11. On May 29, 2015, Erie filed a cross-motion for summary judgment, arguing that it "has no duty to defend Tracy L. Moore, Harold E. McCutcheon, III, or the McCutcheon Estate against the claims asserted against them" because Carly's complaint "seeks damages resulting from acts that are excluded from coverage by" the Homeowner's Policy and the Excess Policy. Pl. Erie Ins. Exchange's Mot. for Summ. J., 5/29/15, at 8-9, 11 ¶¶ 20, 24, 30. Erie requested a declaration that Erie "has no duty to provide a defense, indemnity, or any other coverage to" Moore, McCutcheon III, or the Estate for claims asserted against them in Carly's case "or any other claims arising from the September 26, 2013 incident[.]" *Id.* at 12.

On May 31, 2016,[2] the trial court granted Erie's motion and denied Carly's motion. On June 15, 2016, the trial court formally entered judgment in favor of Erie and against Carly pursuant to Pa.R.C.P. 227.4.

---

[2] On June 24, 2015, between the dates when the parties filed their summary judgment motions and the trial court rendered its decision, Carly amended his complaint against the Estate. The record reflects that Carly notified the trial court of the amendment, *see* Pet. to Reschedule Argument, 7/15/15, ¶¶
*(Footnote Continued Next Page)*

On October 6, 2016, the trial court filed an opinion under Appellate Rule 1925(a) that substantially tracked its May 31, 2016 decision. In that opinion, the court stated: "the deliberate conduct of McCutcheon, Jr. on the night of September 26, 2013 did not constitute an 'occurrence' that would trigger coverage under the language of the homeowner's policy and excess liability policy" and "coverage is barred pursuant to the respective exclusionary clause in both policies." Tr. Ct. Op., 10/6/16, at 5. The court explained its decision with references to some of the facts adduced during discovery in the personal injury case:

> The shooting of Carly plainly resulted from human agency. Moreover, the prospect of injury from a gun firing during a physical struggle over that gun was no less plainly and reasonably anticipated. As such, while tragic, the shooting of Carly by McCutcheon, Jr. cannot fall within the definition of an accident. . . .

*(Footnote Continued)* ───────────────

4-5, and Erie referenced the amended complaint in its subsequent filings, *see* Pl.'s Suppl. Br. in Supp. of Mot. for Summ. J. & Opp. to Def.'s Mot. for Summ. J., 9/1/15, at 1. But there is no indication that the amended complaint was ever made a part of the trial court record in this case, and the trial court's opinion never references or cites to it. Although Carly included a copy of the amended complaint in the reproduced record (R. 1[a]-9[a]), the pleading does not appear in the certified record. Documents that never were part of the record in the trial court may not be placed in the reproduced record. *In re Crespo*, 738 A.2d 1010, 1013 n.2 (Pa. Super. 1999); *see Parr v. Ford Motor Co.*, 109 A.3d 682, 695 n.10 (Pa. Super. 2014) (*en banc*), *appeal denied*, 123 A.3d 331 (Pa.), *cert. denied*, 136 S. Ct. 557 (2015). Because it appears that Carly's amended complaint was never placed into the trial court record, we will not consider it, and we order it stricken from the reproduced record. We note that because the amended complaint apparently bolstered Carly's allegations that the shooting was negligent, our consideration of the amendment would not change our decision.

McCutcheon, Jr. yanked open the door to Terry's residence, forcibly pulled Carly inside by his shirt — itself a tortious act — and engaged in a physical struggle with him while holding a gun. McCutcheon, Jr. was "screaming and swearing" at the time. According to Carly, he grabbed McCutcheon, Jr.'s wrist in an attempt to try to get the gun off of him and the two men engaged in a physical fight during which a couple of shots were fired. (R.R. 14 at p. 4). McCutcheon, Jr. shot Carly in the face once. (R.R. 14 at p. 4). After Carly was shot and fell to the floor, McCutcheon, Jr. did not verbally indicate that he did not mean to injure Carly nor did he attempt to assist Carly in any way. Collectively, this evidence led this Court to the conclusion that McCutcheon, Jr. expected or intended to cause serious harm to Carly within the meaning of the homeowner's policy and excess liability policy. Stated another way, McCutcheon, Jr. acted knowing that such consequences were substantially certain to result. Indeed, Carly's own personal injury complaint makes clear that the type of injury suffered was a reasonably foreseeable consequence of McCutcheon, Jr.'s actions. In that complaint, Carly states that "there was a strong probability of harming [Carly]" and charges McCutcheon, Jr. with "using conduct that created an unreasonable risk of physical harm to [Carly]." (R.R. 1, Exhibit C at p. 5).

***Id.*** at 8-10.[3]

On June 27, 2016, Carly filed a notice of appeal, and he now presents the following issues for our review:

1. Did the trial court err in granting summary judgment in favor of [Erie] and in finding that [Carly]'s injuries did not constitute an "occurrence" under the insurance contract as a matter of law?

2. Did the trial court err in granting summary judgment in favor of [Erie] and in finding that the exclusionary clause of the insurance contract applied due to an "intended" body injury caused by the insured?

---

[3] As we discuss below, the trial court's "R.R." citations are to numbered documents in the certified record. "R.R. 1, Exhibit C" is the complaint in the tort action. "R.R. 14" is Carly's summary judgment motion.

3.      Did the trial court err in granting summary judgment in favor of [Erie] and in finding that the exclusionary clause of the insurance contract applied due to "expected" bodily injury caused by the insured?

4.      Did the trial court mistakenly apply public policy considerations to invalidate insurance coverage in this case?

Carly's Brief at 8-9 (suggested answers omitted).

## The Record

Before addressing Carly's issues, we lament the state of the record, which has encumbered our consideration of this appeal.

Although, as we explain below, the insurance coverage issue must be decided by reviewing the factual allegations in Carly's tort complaint in light of the terms of the insurance policies, both the parties and the trial court make frequent references to facts not included in that complaint. In discussing such facts in its Rule 1925(a) opinion, the trial court provides citations to what it calls "the reproduced record" (abbreviated by the trial court as "R.R."). **See** Tr. Ct. Op. at 2-5 & nn.1, 3. However, the citations are not to the actual reproduced record in this appeal.[4] Rather, upon closer review of the trial court's opinion, it is apparent that the citations are to

---

[4] A "reproduced record" is a "portion of the record that has been reproduced for use in the appellate court." Pa.R.A.P. 102. It is prepared by the appellant and contains copies of the parts of the certified record that the parties elect to provide to the appellate court to assist it in deciding the case. Pa.R.A.P. 2154(a); **see also** Pa.R.A.P. 2151, 2171. Except in cases with large records, in which the rules permit filing of a reproduced record to be deferred, **see** Pa.R.A.P. 2154(b), the reproduced record is filed together with the appellant's brief. Pa.R.A.P. 2186(a). Because Carly did not file his brief and reproduced record in this case until December 22, 2016, the trial court's October 6, 2016 opinion could not have cited to the reproduced record.

- 10 -

numbered documents in the certified record compiled by the trial court for transmission to this Court's prothonotary.[5] In addition, they are not actual citations to record evidence, but instead are citations to recitations of facts set forth in motions filed by the parties.[6]

The factual recitations in the motions cited by the trial court include citations to factual evidence, such as documents and deposition transcripts. *See*, *e.g.*, Carly's Motion for Summ. J. at 4 (citing deposition transcript and medical records). The motions designate some of those materials as exhibits to the motions. But our review of the certified record reveals that it does not contain all of that evidence, and, in particular, does not contain the exhibits to Carly's motion for summary judgment. One of the materials cited most often by the parties, the transcript of a deposition given by Carly in his tort action against McCutcheon's Estate (in which Carly provided details about the events on the evening of the shooting), is among the missing items. Omissions like these significantly impair our ability to consider an appeal. *See Smith v. Twp. of Richmond*, 82 A.3d 407, 417 n.9 (Pa.

---

[5] The certified record is the official record of the case, consisting of the original papers and exhibits filed in the trial court, all transcripts of proceedings, and the trial court docket entries. Pa.R.A.P. 1921. The documents are numbered and assembled by the trial court's clerk for transmission to the appellate court. Pa.R.A.P. 1931(c). Because a reproduced record contains only "portions" of the certified record, Pa.R.A.P. 102, the reproduced record and the certified record are two different things, and it is incorrect to use the same terminology for both.

[6] For example, when the trial court's opinion states, "McCutcheon, Jr. shot Carly in the face once. (R.R. 14 at p. 4)," it is citing to page 4 of Carly's motion for summary judgment, which contains a recitation of facts.

2013) (lamenting similar issue in case before Supreme Court). They are a violation of our rules, under which —

> All involved in the appellate process have a duty to take steps necessary to assure that the appellate court has a complete record on appeal, so that the appellate court has the materials necessary to review the issues raised on appeal. Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.

Pa.R.A.P. 1921, Note.[7] A failure to ensure that the record is complete risks waiver of appellate issues that are dependent on the missing items.[8]

---

[7] When faced with omissions from the certified record, our practice sometimes is to check with the trial court to assure that no materials were excluded from the certified record inadvertently. *See, e.g.*, *Commonwealth v. O'Black*, 897 A.2d 1234, 1238 (Pa. Super. 2006). *See also* Pa.R.A.P. 1921, Note (suggesting procedure to obtain missing documents from trial court). We made such an inquiry here, and were informed that the trial court had certified all materials that it had from this case. We remind counsel that assembly of a complete record "is not the responsibility of this [C]ourt." *O'Black*, 897 A.2d at 1238 (quoted citation omitted).

[8] *See, e.g.*, *Lundy v. Manchel*, 865 A.2d 850, 855 (Pa. Super. 2004) (where appellant based claim on partnership dissolution agreement, but agreement did not appear in the certified record, claim was deemed waived); *Eichman v. McKeon*, 824 A.2d 305, 316 (Pa. Super. 2003) (where issue on appeal was whether trial court erred in failing to sanction defendant for alleged discovery violation, but documents necessary to evaluate that claim were absent from the record, issue was deemed waived), *appeal denied*, 839 A.2d 352 (Pa. 2003). As the Note to Appellate Rule 1921 points out, the responsibility for assuring that needed materials are included in the certified record rests with the party relying on those materials. Because that usually is the appellant — the party seeking relief from the adverse judgment in the trial court — we have frequently stated that the appellant bears this responsibility and risks waiving appeal rights by a failure to comply. *See*, *e.g.*, *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999); Pa.R.A.P. 1931, Expl. Cmt. – 2004. *See also Commonwealth v. Almodorar*, 20 A.3d 466, 467 (Pa. 2011) (discussing shared responsibility of appellant and trial court under Pa.R.A.P. 1931).

On further review, we discovered that Carly included some of the missing materials — including a copy of the Carly deposition transcript — in the reproduced record he filed with his appellate brief. That copy of the transcript is not identified as an exhibit to Carly's summary judgment motion,[9] but Erie has not objected to its validity. If that transcript and the other missing materials that Carly has included in the reproduced record had once been in the trial court record, we may consider them, even though they are now absent from the certified record. Pa.R.A.P. 1921, Note; *Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012); *Commonwealth v. Britt*, 83 A.3d 198, 200 n.3 (Pa. Super. 2013).[10] Unfortunately, we cannot say with confidence whether these materials had once been filed with the trial court. Some of them are referenced by both Carly and Erie in their trial court submissions, suggesting that both parties assumed that they were properly before the trial court. But because the trial court cited only to the factual summaries in the parties' motions, and not to the actual evidence, there is no clear indication in the record that the trial court received and considered these materials.

_____

[9] The transcript ("Notes of Deposition Testimony of Richard Carly") appears in the reproduced record immediately prior to the May 31, 2006 order granting summary judgment. Neither its sequence in the reproduced record (*see* Pa.R.A.P. 2175(a)(2) (requiring chronological arrangement)), nor its identification in the table of contents (*see* Pa.R.A.P. 2174(a) (references to exhibits), 2176(d) (exhibits to be "suitably noted")) makes clear whether the transcript was filed with Carly's summary judgment motion.

[10] As discussed in note 2, *supra*, we may not consider documents (such as Carly's amended complaint in the tort action) that are included in the reproduced record if they were never filed with the trial court.

Because no party has raised this issue, and because we are unwilling to assume that the trial court would have based its decision on facts summarized in the parties' motions without verifying those facts from a review of the evidence cited by the parties, we will assume that these materials were in fact filed with the trial court, even though they are now missing from the certified record. Our willingness to make this assumption is based in large part on the fact, as discussed below, that the controlling document that determines the nature of Carly's claims in his tort case is his complaint, and that these other materials — although relied on by the parties and the trial court — should be extraneous to the legal analysis. If these materials played a more material role in this case, we might instead have had to remand this matter to the trial court so that the proper state of the record could be clarified.

We have described the process by which we were required to chase down some of the cited materials in this case to illustrate the difficulties and delays that occur when our rules are not followed. This Court's heavy appellate docket does not afford us the ability to search for missing record items in each of our cases. Compliance with the applicable rules should have obviated the record issues we encountered here. The requirements of our rules are not mere technicalities; their compliance helps to assure our efficient resolution of the matters before us. All parties to an appeal are responsible for assuring that their case is presented to us in a manner that permits our efficient appellate review. We admonish counsel for the parties

— and, particularly, counsel for Carly, as it is Carly's materials that are missing here — to take greater care to comply with our rules in the future.

## The Merits

The standards governing summary judgment are well established:

When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.

*Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 264 (Pa. Super.) (*en banc*) (citation omitted), *appeal denied*, 34 A.3d 832 (Pa. 2011).

Carly's first three issues all concern interpretation of the Homeowner's Policy and the Excess Policy and the Policies' application to the facts alleged in Carly's tort complaint. We therefore consider these issues together. Our resolution makes it unnecessary to address Carly's fourth issue.

We stated the governing law in *Penn-America*:

An insurer's duty to defend and indemnify the insured may be resolved via declaratory judgment actions. In such actions, the allegations raised in the underlying complaint alone fix the insurer's duty to defend. As this Court has summarized:

- 15 -

> The duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage. Moreover, the insurer agrees to defend the insured against any suit arising under the policy even if such suit is groundless, false, or fraudulent. Since the insurer agrees to relieve the insured of the burden of defending even those suits which have no basis in fact, the obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy.
>
>         \*     \*     \*
>
> The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint. *See* [*Donegal Mut. Ins. Co. v.*] *Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290 (2007) ("The language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation."). . . .

*Penn-America*, 27 A.3d at 265 (internal quotation marks, brackets, and most citations omitted).

Both Erie Policies provide coverage for injury or damage resulting from an "occurrence." The Homeowner's Policy defines an "occurrence" as "an accident including continuous or repeated exposure to the same general harmful conditions." Homeowner's Policy at 5. The Excess Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage which is neither expected nor intended." Excess Policy at 3 (emphasis omitted). Both Policies exclude coverage for conduct that is "expected or intended" by the insured. Homeowner's Policy at 15; Excess Policy at 4.

Carly contends that the trial court "erred in granting summary judgment, finding that [his] injuries did not constitute an 'occurrence' as defined by the contract[s] and Pennsylvania law." Carly's Brief at 30. Carly continues:

> The Pennsylvania Supreme Court has defined "accident" within an insurance contract as "an unexpected and undesirable event occurring unintentionally, and that the key term in the definition of the 'accident' is 'unexpected' which implies a degree of fortuity." *Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 158, 938 A.2d 286, 292 (2007). "An injury therefore is not 'accidental' if the injury was the natural and expected result of the insured's actions." *Id.*
>
> *        *        *
>
> In determining whether Erie has a duty to defend, th[is] Court must view the events from the perspective of the insured — in this case, McCutcheon. *See State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) ("In determining whether [the plaintiff's] injuries resulted from an accident, we must view the operative events from [defendant's] perspective, for State Farm insured him not [plaintiff]."); *Baumhammers*, 595 Pa. at 159, 938 A.2d at 293 ("[W]e are required to determine whether, from the perspective of the insured, the claims asserted . . . present the degree of fortuity contemplated by the ordinary definition of 'accident.'").

*Id.* at 31-32 (alterations in original). Based on established definitions of the Policies' terms under Pennsylvania law, Carly concludes that the trial court "erred in finding that Carly's injuries did not qualify as an accident." *Id.* at 33.

Erie answers that, while it agrees that the Policies limit coverage to harm caused by an "occurrence" during the policy period, Carly's complaint "describes deliberate conduct as the cause of Carly's harm, and such

conduct does not constitute an 'occurrence' covered by the insurance policies." Erie's Brief at 14.

The parties' competing positions require us to decide how the Policies' terms apply to infliction of a gunshot wound during an altercation between two participants. As some of the cases cited by Erie make clear, gunshot wounds commonly are inflicted deliberately, and the shooter generally expects and intends that the gunshot will inflict harm. In the trial court's words, "the prospect of injury from a gun firing during a physical struggle over that gun was . . . plainly and reasonably anticipated." Tr. Ct. Op. at 7. But not all injuries from gun violence are intentional. Firearms are dangerous instrumentalities, and although their danger makes the risk of potential harm foreseeable, the question whether an insurance policy covers injury from a gun does not turn merely on whether harm should have been "reasonably anticipated." As we explained in *United Servs. Auto. Ass'n v. Elitzky*, 517 A.2d 982 (Pa. Super. 1986), *appeal denied*, 528 A.2d 957 (Pa. 1987): "Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage. The exclusion is inapplicable even if the insured should reasonably have foreseen the injury which his actions caused." *Id.* at 987 (citation omitted). In resolving whether the insurer had an obligation to defend, the Court in *Elitzky* summarized *Mohn v. Am. Cas. Co. of Reading*, 326 A.2d 346 (Pa. 1974):

In **Mohn**, a beneficiary sought to recover on an insurance contract after the insured was fatally wounded by a policeman while fleeing from a burglary. The insurer disclaimed coverage, asserting that the insured's injury was the reasonably foreseeable result of his own wrongful actions. The Supreme Court rejected this argument and held that coverage was not excluded. The Court ruled that the doctrine of for[e]seeability is inapplicable to the interpretation of insurance contracts. The Court agreed with reasoning similar to that employed [in **Continental Western Ins. Co. v. Toal**, 244 N.W.2d 121 (Minn. 1976)]. Both courts held that the interpretation of an insurance contract is controlled by the intention of the parties and technical legal concepts such as for[e]seeability are little help in understanding an insured's intent.

517 A.2d at 987. Quoting **Nationwide Mut. Ins. Co. v. Hassinger**, 473 A.2d 171, 175 (Pa. Super. 1984), we added: "intent means that the 'actor desired to cause the consequences of his act' or that he acted knowing such consequences were 'substantially certain to result . . . .'" 517 A.2d at 989.

Thus, to decide the question before us, we must look not to abstract notions about the reasonably foreseeable results of gun violence but to the specific events that gave rise to Carly's injuries as a result of McCutcheon's brandishing of a firearm. We must determine from those events whether it is so clear that McCutcheon "desired to cause the consequences of his act" or had such knowledge that those consequences "were substantially certain to result" that, as a matter of law, we may deem his conduct intentional and outside the coverage provided under Erie's Policies.

In addressing this issue, at least insofar as it relates to Erie's duty under the Policies to provide McCutcheon's Estate with a defense to Carly's lawsuit, we must consider "the allegations raised in [Carly's] complaint

- 19 -

**alone**." *Penn-America*, 27 A.3d at 265 (emphasis added).[11] "Since the insurer agrees to relieve the insured of the burden of defending even those suits which have no basis in fact, the obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy." *State Farm Fire & Cas. Co. v. DeCoster*, 67 A.3d 40, 45 (Pa. Super. 2013) (citation omitted). Therefore —

> [I]t is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend. In making this determination, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured.

*Id.* at 46 (citation omitted). Thus, as Erie points out, we may not consider facts outside of the allegations in Carly's pleading, even though some of those facts were adduced through discovery in Carly's case. *See Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896-97 (Pa. 2006); *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 747 (Pa. 1999).[12] Instead, we focus only on Carly's complaint.

---

[11] An insurer's duty to indemnify is not as broad as its duty to defend, and in assessing the duty to indemnify, "we are not limited to the claims pled." *Wolfe v. Ross*, 115 A.3d 880, 890 (Pa. Super.) (*en banc*), **appeal denied**, 125 A.3d 408 (Pa. 2015). On the facts of this appeal, Erie does not argue that there is a difference between its duty to defend and to indemnify, and we therefore do not analyze the issues separately here.

[12] Of course, evidence obtained through discovery may be used to seek summary judgment in the tort action, and, if such a motion successfully removes all insured claims from the case, the insurer will no longer have a duty to defend. But until the proceedings in the tort case "confine the claim to a recovery excluded from the policy," *Penn-America*, 27 A.3d at 265, the insurer remains obligated to defend, regardless of what the discovery reveals.

Carly's complaint alleges that after writing a note to his children stating what he intended to do, McCutcheon went to the home of his former wife Terry to kill her and then commit suicide. Complaint, *Carly v. Moore*, ¶¶ 5, 8-9, 11-12. After McCutcheon killed Terry, Carly arrived at the home and rang the doorbell. *Id.* ¶ 15. When no one answered, Carly put his hand on the doorknob to try to open it and "was suddenly pulled inward by [McCutcheon,] who grabbed [Carly] by his shirt and pulled him into the home." *Id.* ¶ 16. McCutcheon had a gun in his hand, and was "screaming, swearing, incoherent, and acting 'crazy.'" *Id.* ¶¶ 17-18. Carly and McCutcheon then fought, and during their struggle, McCutcheon "toss[ed] . . . around" the arm in which he held the gun, "thereby recklessly shooting off various rounds in and about the room where [McCutcheon and Carly] were struggling." *Id.* ¶¶ 18-19, 21(g). McCutcheon "knock[ed] things around" and fired the gun "negligently, carelessly, and recklessly." *Id.* ¶ 19. The gunshots hit "various parts of the interior of the residence," and one of the shots hit Carly in the face, causing his injuries. *Id.* ¶¶ 19-20. Carly alleges that "[a]ll of the injuries and damages sustained by [him] were solely and wholly, directly and proximately caused by the negligence, carelessness and recklessness of [McCutcheon]." *Id.* ¶ 21.

These allegations, when "taken as true and liberally construed in favor of the insured," *DeCoster*, 67 A.3d at 46, set forth a claim that McCutcheon accidentally shot Carly while he waived around his gun during their struggle. They allege a chaotic brawl in which McCutcheon fired his gun wildly while

trying to fight Carly off. The alleged events fit the Policies' definitions of a covered "occurrence," rather than conduct deliberately intended to inflict harm.

Erie contends that the repeated descriptions of McCutcheon's conduct in Carly's complaint as "negligent" and "careless" are not determinative here, as it is the alleged facts that control, and not the language of an "artful pleading." Erie's Brief at 13 (citing **Haver**, 725 A.2d at 745). We agree. The legal terminology used by Carly in pleading his case cannot control the outcome. What does control is that, contrary to Erie's argument, the facts Carly pleads fairly portray a situation in which injury may have been inflicted unintentionally. As the trial court observed, it is impossible to "know with certainty what McCutcheon, Jr.'s state of mind was that night," Order, 5/31/16, at 7, and it may be that McCutcheon actually intended to shoot Carly in the face. But Carly's complaint alleges otherwise, and we are bound to accept Carly's factual allegations as true. We have no reason to do otherwise. The allegations make clear that McCutcheon went to his former wife's home to kill her and himself — not Carly; indeed, they make clear that Carly's arrival at the home was totally unplanned and unexpected. Moreover, there is nothing in the complaint to suggest that McCutcheon knew that Carly was his ex-wife's boyfriend and would therefore have had that motivation to deliberately shoot him. The trial court's labeling of McCutcheon's shooting of Carly as "deliberate conduct," Tr. Ct. Op. at 5, does not match the allegations of the complaint.

The facts alleged by Carly bear no resemblance to those of the willful assault cases on which Erie relies. In **Ohio Cas. Grp. v. Bakaric**, 513 A.2d 462 (Pa. Super. 1986), **appeal denied**, 520 A.2d 1384 (Pa. 1987), in which the insured shot his wife as he pressed the barrel of his gun to her face while pushing her from his car, the holding that there was no coverage was based on a finding at trial that the husband expected to inflict his wife's injuries when he pointed his gun at her. **See id.** at 464. In **Erie Ins. Co. v. Fidler**, 808 A.2d 587, 589-90 (Pa. Super. 2002), the insured threw his victim against a wall, intending to assault him; we held that an allegation that the insured did not intend to inflict the resulting injuries could not bring that case within the policy. Here, Carly's pleading alleges erratic gunfire in the course of an unplanned struggle. The Policies cover such an occurrence.

In reaching its contrary conclusion, the trial court said that "the facts that [it] relied upon to make its determination come from Carly's personal injury complaint, Carly's pleadings and motions, and Carly's deposition testimony." Tr. Ct. Op. at 8.[13] As we have discussed, it was error for the trial court to base its decision on anything other than Carly's complaint and

---

[13] The court's opinion cited to the following documents in the certified record: "R.R. 1, Exhibit C," Carly's personal injury complaint; "R.R. 14," Carly's summary judgment motion; "R.R. 17," Carly's brief in support of his summary judgment motion; and "R.R. 20," Carly's rebuttal brief in support of summary judgment. The court also cited to "R.R. 16," which it identified in parentheses as Carly's deposition. But in the record certified to this Court by the trial court, the document numbered 16 is Erie's summary judgment motion; the court's citations to pages of document 16 correspond to pages of Erie's motion that contain quoted excerpts from the Carly deposition transcript.

the terms of Erie's policies. *See Kvaerner*, 908 A.2d at 896-97; *Penn-America*, 27 A.3d at 265. We note, however, that even though the trial court's factual recitation contains details of the September 16, 2013 events that are not included in Carly's complaint, none of those details alters Carly's basic narrative, which is that he was shot as McCutcheon waived around his gun during his and Carly's altercation.[14] The trial court erred in concluding that this narrative failed to allege events within the scope of coverage under Erie's policies.

---

[14] The trial court's recitation omits some of Carly's factual allegations (such as those in Paragraphs 19, 20, and 21(g) of the complaint) that describe wild gunfire during the altercation and support the averment that the shooting was not a deliberate act. The trial court describes the altercation between Carly and McCutcheon as follows:

> Having received no answer to ringing the doorbell, Carly put his hand on the door knob to enter the residence when the door was yanked open by McCutcheon, Jr. who then grabbed Carly by his shirt and forcibly pulled him inside. (R.R. 1, Exhibit C at p. 4; R.R. 14 at p. 3; R.R. 17 at p. 1). McCutcheon, Jr. was holding a gun that unbeknownst to Carly, he had used to murder Terry, and he was "swearing and screaming like a maniac." (R.R. 1, Exhibit C at p. 4; R.R. 14 at p. 3; R.R. 16 at p. 7 (Carly Deposition); R.R. 17 at pp. 1-2; R.R. 20 at p. 2). A struggle between Carly and McCutcheon, Jr. ensued during which Carly was shot in the face. (R.R. 1, Exhibit C at p. 5; R.R. 14 at p. 4; R.R. 17 at p. 2). According to Carly's deposition testimony, he fell to the floor exclaiming "You shot me. Are you crazy?" (R.R. 16 at p. 7 (Carly Deposition)). To which, McCutcheon, Jr. responded, "You're fucking right I am. Oh, well. Lay there and bleed like a deer; like a fucking deer." (R.R. 16 at p. 7 (Carly Deposition)).

Tr. Ct. Op. at 2-3 (footnote omitted). The trial court adds, "According to Carly, he grabbed McCutcheon, Jr.'s wrist in an attempt to try to get the gun off of him and the two men engaged in a physical fight during which a couple of shots were fired. (R.R. 14 at p. 4). McCutcheon, Jr. shot Carly in the face once. (R.R. 14 at p. 4)." *Id.* at 10.

In explaining its decision, the trial court noted that McCutcheon "yanked open the door to Terry's residence" and "forcibly pulled Carly inside by his shirt," conduct that the court says was "itself a tortious act." Tr. Ct. Op. at 9. We fail to see how this fact proves that McCutcheon shot Carly intentionally. Carly arrived at Terry McCutcheon's house unexpectedly, and, after no one answered the doorbell, he grabbed the doorknob to try to enter, provoking McCutcheon's reaction of opening the door and grabbing Carly. Notably, McCutcheon did not react by opening the door and shooting Carly in the doorway. McCutcheon's yanking of Carly into the house may have qualified as an assault, an intentional act, but Carly has not sued McCutcheon's Estate for that act; he sued for what happened later.

The trial court also stated that the struggle began when Carly tried to grab McCutcheon by the wrist in an attempt to disarm him. Tr. Ct. Op. at 10. Although it was error for the court to rely on this fact because it is not in Carly's complaint, this fact also fails to show that McCutcheon shot Carly deliberately. Rather, viewing the operative events from McCutcheon's perspective, *see Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 293 (Pa. 2007), Carly's initiation of the struggle suggests that McCutcheon may have fired shots defensively to ward off Carly.

Apparently again relying improperly on facts from Carly's deposition, the trial court next says, "After Carly was shot and fell to the floor, McCutcheon, Jr. did not verbally indicate that he did not mean to injure Carly nor did he attempt to assist Carly in any way." Tr. Ct. Op. at 10. This

observation may be true, but there is no requirement that an insured disclaim an intent to harm in order to be entitled to insurance coverage. We see nothing in Carly's account of McCutcheon's conduct after the shooting to suggest that McCutcheon shot Carly deliberately. Rather, even though McCutcheon had just struggled with Carly and Carly now lay on the floor wounded and exposed, McCutcheon did not shoot Carly again; instead, he said he would leave Carly on the floor bleeding, an indication of indifference to Carly's fate. We repeat, however, that Carly's account at his deposition is not controlling here; all that matters is what Carly alleged in his complaint.

Because the complaint alleges that the shooting of Carly was accidental, the shooting must be considered an "event occurring unintentionally" that is within the coverage of the Policies. **Baumhammers**, 938 A.2d at 292. And because, under the allegations, McCutcheon did not "intend[] the resultant damage," the exclusions do not apply. **United**, 517 A.2d at 987. We therefore hold that Erie has a duty to defend the defendants in Carly's tort action. Accordingly, we vacate the judgment declaring that Erie has a duty neither to defend nor indemnify the defendants,[15] reverse the order granting summary judgment in favor of Erie, and remand to the trial court for entry of a summary judgment in favor of Carly.

---

[15] Of course, whether Erie ultimately has an obligation to indemnify the defendants depends on the outcome of the tort action and the basis for any judgment against the defendants in that action.

Judgment vacated. Order granting summary judgment in favor of Erie reversed. Declaration regarding coverage reversed. Case remanded for disposition in accordance with this opinion. Pages 1 to 9 of Reproduced Record stricken. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2017